# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| CAVEL INTERNATIONAL, INC., et al. | ) | |
| | ) | JUDGE FREDERICK J. KAPALA |
| Plaintiffs, | ) | |
| | ) | CASE NO. 3:07-CV-50100 |
| v. | ) | |
| | ) | |
| LISA MADIGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure and Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, Plaintiffs Cavel International, Inc., James D. Tucker, Randy Beasley, Angela Fabris, Ruben Gonzalez, Brad D. Melville, Amparo Milan, Raul Milan, Raul Escutia Milan, Roberto Resendiz, Ron Warner and Isaac Zamora, respectfully move the Court for an injunction pending appeal of the Court's July 5, 2007 order and judgment (ECF Nos. 105 & 106) to maintain the status quo that was in effect until expiration of the temporary restraining order on June 28, 2007.

The Court is well aware of the factual and procedural background of this litigation, and Plaintiffs will not repeat it here, except to update the Court. Since expiration of the temporary restraining order on June 28, 2007, Cavel has been unable to operate. (Tucker Declaration ¶ 3 (attached at Exhibit 1).) As a result, Cavel has laid off all but six employees, who perform maintenance or administrative work. (*Id.* ¶ 4.) Throughout its twenty-year history, Cavel has not slaughtered animals other than horses at its DeKalb plant (June 14, 2007 Transcript at 52 (attached at Exhibit 2)), and more than 98% of Cavel's business derives from the sale of

horsemeat for human consumption overseas (*id.* at 50–52). Cavel does not own or operate any other facilities (*id.* at 46), and its only assets are those at the DeKalb plant (*id.* at 46–47). A formerly profitable company, which had lawfully operated since 1987 in DeKalb, Illinois and made a substantial investment in a plant designed and used for a specific purpose, is now losing money (Tucker Declaration ¶ 6) and threatened with the loss of its business before its appeal as of right to the Seventh Circuit can be concluded (*id.* ¶¶ 7 & 8).

## STANDARD OF REVIEW

A motion for issuance of an injunction pending appeal is analyzed under the same equitable factors that govern granting a stay pending appeal. *See, e.g.,* __ Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2904, at 501 & n.9 (2d ed. 1995). Accordingly, the Court balances: (1) success on the merits; (2) the irreparable harm to movant absent an injunction; (3) the injury, if any, to the other parties; and (4) whether a stay is in the public interest. *See, e.g., Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006); *In re Forty-Insulations, Inc.* 115 F.3d 1294, 1300–01 (7th Cir. 1997).

When weighing these factors, the Court employs the same "sliding scale" approach used to determine whether to grant preliminary injunctive relief. *See, e.g., Pennington v. Doherty*, No. 85-C-6327, 1997 U.S. Dist. LEXIS 2318, at *8 (N.D. Ill. Feb. 27, 1997) (citing *Thomas v. City of Evanston*, 636 F. Supp. 587, 590–91 (N.D. Ill. 1986)), and *Miller v. LeSea Broad., Inc.*, 927 F. Supp. 1148, 1151–52 (E.D. Wis. 1996)) (attached at Exhibit 3). Therefore, a weak showing as to one factor, even success on the merits, can be overcome by a strong showing as to the others. *See, e.g., Hilton*, 481 U.S. at 778; *Pennington*, 1997 U.S. Dist. LEXIS 2318, at *8; *Miller*, 927 F.

2

Supp. at 1151–52; *EEOC v. Quad/Graphics, Inc.*, 875 F. Supp. 558, 560 (E.D. Wis.), *aff'd*, 63 F.3d 642 (7th Cir. 1995); *Thomas*, 636 F. Supp. at 590–91.

## LAW AND ARGUMENT

## I. EACH OF THE FOUR EQUITABLE FACTORS FAVORS GRANTING INJUNCTIVE RELIEF PENDING APPEAL.

Each of the four equitable factors favors issuance of an injunction pending appeal here.

### A. Injunctive Relief Pending Appeal Is Necessary to Prevent Substantial Harm to Plaintiffs.

In the Court's order granting a temporary restraining order, the Court found "that a substantial injury would be suffered by plaintiffs if a TRO is not granted." (June 1, 2007 Order at 4.) The harm facing Plaintiffs now is no less substantial. Before issuance of the temporary restraining order, Cavel was unable to operate and was forced to lay off 54 of its 63 employees. Since expiration of the temporary restraining order on June 28, 2007, Cavel has again been unable to operate. (Tucker Declaration ¶ 3.) As a result, all but six of Cavel's employees have lost their jobs. (*Id.* ¶ 4.) Because more than 98% of Cavel's business derives from processing horsemeat for human consumption, Cavel is threatened with the loss of its business before concluding its appeal as of right to the Seventh Circuit. (*Id.* ¶¶ 7 & 8.)

The threatened loss of Cavel's business constitutes irreparable harm for which injunctive relief is appropriate. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (recognizing that money damages may be inadequate when plaintiff forced to close business). Significantly, Plaintiffs have no adequate remedy at law for this substantial harm. Under the Eleventh Amendment, Plaintiffs may not recover money damages from Defendants sued in their official capacities. *See, e.g., Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005).

3

Moreover, absent injunctive relief pending appeal, Plaintiffs are exposed to the risk of criminal prosecution. The Supreme Court has recognized that the threat of criminal prosecution constitutes irreparable injury. *See Doran*, 422 U.S. at 932. H.B. 1711 imposes criminal penalties against any person who violates its provisions. As a result, the statute exposes Plaintiffs to criminal prosecution for performing the same acts – the purchase, slaughter, and processing of horsemeat – that they have performed for twenty years. Indeed, on multiple occasions, Defendants refused to offer any assurances that prosecution will await resolution of Plaintiffs' constitutional challenge in this Court, let alone the court of appeals. Accordingly, Plaintiffs face a Hobson's choice: relinquish their jobs and business or risk criminal prosecution. As the Court previously recognized, Plaintiffs face substantial irreparable harm absent injunctive relief.

**B.    Plaintiffs Have Made a Sufficient Showing of Likelihood of Success.**

"Clearly, any trial judge is reluctant to find that a substantial likelihood exists that he or she will be reversed." *Sweeney v. Bond*, 519 F. Supp. 124, 132 (E.D. Mo. 1981). And that is not the test. Indeed, a movant need not demonstrate a mathematical probability of prevailing. *See, e.g., Thomas*, 636 F. Supp. at 590 (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C. Cir. 1977)).

All that is required is "a substantial case on the merits." *Hilton*, 481 U.S. at 778; *Quad/Graphics*, 875 F. Supp. at 560; *United States ex rel. Partee v. Lane*, No. 87-C-2814, 1990 U.S. Dist. LEXIS 2630, at *1 (N.D. Ill. Mar. 9, 1990) (citing *Hilton*, 481 U.S. at 777) (attached at Exhibit 4). Where a case presents a question of first impression, courts have issued injunctions pending appeal. *Sweeney*, 519 F. Supp. at 132 (collecting cases); *cf. Chicago & N.W. Ry. Co. v. United Transp. Union*, 471 F.2d 366, 368 (7th Cir. 1972) (Clark, J., sitting by designation).

4

This litigation raises substantial questions regarding the constitutionality of H.B. 1711 under the United States and Illinois Constitutions. These questions implicate the state's power to enact economic regulations in our federal system where the national government has plenary power over interstate and foreign commerce – issues at the core of the federal Constitution – in an increasingly global economy. Indeed, the Court has recognized that the Fifth Circuit's decision in *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007), did not address a Foreign Commerce Clause challenge (July 5, 2007 Order at 6), under which laws are subject to strict scrutiny, *see, e.g., Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980). As such, this litigation raises questions of first impression under the Foreign Commerce Clause. Likewise, the Fifth Circuit did not address the issues Plaintiffs raised under the Illinois Constitution, nor whether the preemption analysis under the Supremacy Clause would be decided differently under the law of the Seventh Circuit. In these respects, this litigation also presents a substantial case and raises questions of first impression.

### C. Injunctive Relief Pending Appeal Will Not Prejudice Defendants.

Injunctive relief pending appeal will not harm Defendants; rather, the grant of injunctive relief will simply maintain the status quo for the relatively short time the appeal is pending. While Cavel lawfully operated in DeKalb for twenty years, Illinois only recently decided to enact H.B. 1711. Cavel's twenty-year history of lawfully operations outweighs any harm to Defendants from a relatively brief delay in enforcement of this new statute during an appeal raising substantial constitutional questions.

### D. The Public Interest Will Be Served by Granting Injunctive Relief Pending Appeal.

The public interest lies in granting injunctive relief pending Plaintiffs' appeal. Cavel employs more than fifty people at its DeKalb plant (July 14, 2007 Transcript at 53), had

5

a payroll exceeding $2 million in 2006 (Verified Complaint ¶ 3), and paid over $200,000 in various taxes last year (*id.*). Further, Cavel has lawfully operated for twenty years, while Illinois has only recently outlawed Cavel's operations. Moreover, there is a strong public interest in not shuttering an otherwise viable and lawful going concern before the courts have finally determined substantial constitutional questions.

In contrast, a refusal to grant injunctive relief pending appeal would not serve the public interest. Since Cavel will simply continue the operation of its business as it has done since 1987 for the relatively brief period of time necessary for an appeal, an injunction will maintain the status quo, benefiting the parties and promoting the orderly conclusion of Plaintiffs' appeal and, should it come to pass, the orderly wind down of Cavel's business.

Further, the public interest supports issuing an injunction without requiring Plaintiffs to post a bond. The requirement of a bond rests within the Court's sound discretion. *See, e.g., Lightfoot v. Walker*, 797 F.2d 505, 507 (7th Cir. 1986). A bond is designed to compensate the opposing party in the event that an injunction was erroneously entered. Since Defendants' interest in immediate enforcement of H.B. 1711 is not quantifiable, no bond should be required. To the extent that this Court concludes that a bond is required, only a nominal bond should be required.

## II. BALANCING THE EQUITIES FAVORS AN INJUNCTION PENDING APPEAL.

Plaintiffs have made a strong showing of immediate and substantial injury for which there is no adequate remedy at law. Absent injunctive relief, Plaintiffs face the choice of performing the same business and jobs, as they have done for the past twenty years, or risking criminal prosecution. Further, the time necessary to resolve Plaintiffs' appeal threatens to cause the permanent loss of Plaintiffs' business, regardless of the ultimate outcome of the

6

case on appeal. In contrast to the irreparable harm to Plaintiffs, to the extent Defendants will be harmed at all by an injunction pending appeal, such harm is intangible and slight. Moreover, the public interest in the continued employment by Cavel of those other than the individual Plaintiffs, in the benefits to third parties from Cavel's business (*see, e.g.*, June 14, 2007 Transcript at 51), and in resolution of the substantial constitutional questions at issue favors an injunction pending appeal. *See, e.g., TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997) (citing *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1291–92 (7th Cir. 1996)).

Because these factors favor an injunction pending appeal, in particular the severity of harm to Plaintiffs, the threshold for success on the merits is relaxed. *See, e.g., Hilton*, 481 U.S. at 778. Plaintiffs' claims present a substantial case by raising significant constitutional questions, including questions of first impression. Moreover, the "rigorous and searching" scrutiny to which state laws are subject under the Foreign Commerce Clause demonstrates that there are substantial and significant questions regarding the constitutionality of H.B. 1711 and that there is sufficient likelihood of success to warrant injunctive relief under Rule 62(c) to maintain the status quo pending appeal.

Recently, the D.C. Circuit balanced the equities and granted Cavel's emergency motion for a stay pending appeal when The Humane Society of the United States ("HSUS") challenged a rule promulgated by the United States Department of Agriculture affecting the horse slaughter inspection system. (*See Humane Society of the United States v. Johanns*, Case No. 07-5120, Order at 2 (D.C. Cir. May 1, 2007) (per curiam) (attached at Exhibit 5).) There, the district court denied Cavel's motion for a stay pending appeal after granting HSUS's motion for summary judgment. The D.C. Circuit, however, granted a stay,

70530423v1 877321

concluding that Cavel would be unable to operate during the pendency of the appeal as a result of the district court's order, and thus would be irreparably injured. *Id.* The D.C. Circuit further found that HSUS would not be harmed by a stay, and that the stay would serve the public interest. *Id.* Notably, that litigation does not raise constitutional issues, in contrast to this case. Like this case, however, the equities on balance favor relief pending appeal.

## CONCLUSION

For all these reasons, for good cause shown and in the interests of justice, Plaintiffs respectfully request that this Court issue an injunction pending appeal, to maintain the status quo by temporarily enjoining enforcement of H.B. 1711 for the relatively brief period this case is on appeal, and for such other relief as the Court determines is just and appropriate.

In the alternative, the Court has the discretion to condition an injunction pending appeal on such conditions as it deems appropriate to protect the rights of the prevailing party. *See, e.g., Pennington*, 1997 U.S. Dist. LEXIS 2318, at *8. In granting and extending the temporary restraining order, the Court balanced the harm to Plaintiffs and the other equitable factors and concluded that injunctive relief was warranted under the expedited schedule. The Court may achieve the same result by conditioning an injunction pending appeal on (1) the immediate filing of a notice of appeal (instead of the normal 30 days), and (2) a prompt motion in the court of appeals to expedite briefing and argument. The Seventh Circuit previously set a quick briefing scheduling on HSUS's appeal from the denial of its motion to intervene and has requested a status report by July 17. Plaintiffs have demonstrated a commitment to proceeding expeditiously in this Court and are prepared to do so in the court of appeals if necessary. Accordingly, in the alternative, Plaintiffs respectfully request that the Court exercise its discretion by conditioning an

8

injunction pending appeal on those terms it deems necessary and justified to secure a prompt and

expeditious resolution in the court of appeals.

Respectfully submitted,


/s/ Thomas J. Lester
Thomas J. Lester
    *tlester@hinshawlaw.com*
Thomas F. Ging
    *tging@hinshawlaw.com*
HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, Illinois 61105
(815) 490-4900
(815) 490-4901 (facsimile)

J. Philip Calabrese
    *pcalabrese@ssd.com*
James P. Murphy
    *jmurphy@ssd.com*
Saber W. VanDetta
    *svandetta@ssd.com*
SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8500
(216) 479-8780 (facsimile)

*Counsel for Plaintiffs*

70530423v1 877321

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

CAVEL INTERNATIONAL, INC., *et al.*,  )
                                       )
            Plaintiffs,                )
                                       )    JUDGE FREDERICK J. KAPALA
      v.                               )
                                       )    CASE NO. 3:07-CV-50100
LISA MADIGAN, *et al.*,                )
                                       )
            Defendants.                )
                                       )

## DECLARATION OF JAMES TUCKER

I, JAMES TUCKER, being first duly sworn, depose and say:

1.    This Declaration is made on personal knowledge. If called as a witness, I am competent to testify to the matters stated herein.

2.    I am the General Manager of Cavel International, Inc. ("Cavel").

3.    Five work days have passed since the temporary restraining order entered by this Court expired on Thursday, June 28, 2007. Since the expiration of the temporary restraining order, Cavel has not slaughtered any horses.

4.    Since June 28, 2007, Cavel has laid off all but six of its employees. The remaining employees perform maintenance or administrative work.

5.    Over the five work days since June 28, 2007, Cavel has lost over $350,000 in revenue.

6.    Over the five work days since June 28, 2007, instead of turning a weekly profit, Cavel has lost in excess of $20,000 attributable to the wages of its remaining employees, fixed costs and overhead.



EXHIBIT
1

7. Cavel cannot sustain the losses if it is currently incurring for any substantial period of time. If Cavel cannot operate while this appeal is pending, permanent closure of the DeKalb plant is virtually certain, regardless of the eventual outcome of the appeal.

8. Without the ability to sell horsemeat for human consumption overseas, Cavel will be unable to stay in business. While Cavel sells other horse by-products, without the sale of horsemeat for human consumption overseas, the DeKalb plant will be unprofitable and unable to stay in business, resulting in the loss of all employees and the loss of the substantial investment Cavel has made in plant and equipment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 7, 2007.

James Tucker

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | WESTERN DIVISION |

| | | |
|---|---|---|
| 3 | CAVEL INTERNATIONAL, INC., ) | Docket No. 07 C 50100 |
| | et al., ) | |
| 4 | ) | |
| | Plaintiffs, ) | Rockford, Illinois |
| 5 | ) | Thursday, June 14, 2007 |
| | v. ) | 1:30 o'clock p.m. |
| 6 | ) | |
| | LISA MADIGAN, et al., ) | |
| 7 | ) | |
| | Defendants. ) | |
| 8 | | |

8

                    TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE FREDERICK J. KAPALA

10   APPEARANCES:

11   For the Plaintiffs:        SQUIRES, SANDERS & DEMPSEY L.L.P.
                                (4900 Key Tower,
12                               127 Public Square,
                                Cleveland, Ohio  44114-1304) by
13                              MR. J. PHILIP CALABRESE
                               MS. SABER W. VANDETTA
14
                               HINSHAW & CULBERTSON
15                              (100 Park Avenue,
                                P.O. Box 1389,
16                               Rockford, Illinois  61106-1389) by
                               MR. THOMAS J. LESTER
17
     For the Defendants:        LISA MADIGAN
18                              ATTORNEY GENERAL
                                (100 W. Randolph Street,
19                               Chicago, Illinois  60601) by
                               MS. ALICE E. KEANE
20                             MS. RACHEL FLEISCHMANN
                               Assistant Attorneys General
21
                               RONALD G. MATEKAITIS
22                             DE KALB COUNTY STATE'S ATTORNEY
                                (State's Attorney's Office,
23                               Sycamore, IL  60178) by
                               MR. JOHN E. FARRELL
24

25

**EXHIBIT**

2

Tucker - Direct

1    the stand.

2          THE COURT:  Raise your right hand.

3       (Witness duly sworn.)

4          JAMES TUCKER, PLAINTIFFS' WITNESS, SWORN

5                  DIRECT EXAMINATION

6    BY MR. CALABRESE:

7    Q.  Good afternoon, Mr. Tucker.

8    A.  Good afternoon.

9    Q.  Would you please introduce yourself to the court?

10   A.  My name is James Tucker.  I'm the general manager of Cavel

11   International.

12   Q.  Mr. Tucker, what is your educational background?

13   A.  I have a Bachelor's degree in economics or a major in

14   economics from Northern Illinois University and a Master's

15   degree in economics from Northern Illinois University and some

16   other study.

17   Q.  How long have you worked at Cavel International?

18   A.  I was employed for a period of about five years from the

19   late '80s to early 90s.  I was away from Cavel until I began

20   working with them in May of 2001, and I've been with them since.

21   Q.  And as general manager of Cavel, what are your

22   responsibilities?

23   A.  As general manager, I'm generally responsible for

24   everything.  Under me are a plant manager that runs the plant,

25   we have a shipping department, a maintenance department that

1  takes care of the maintenance and sewage treatment and such, and

2  I'm also responsible for the office staff.

3  Q.  Do your responsibilities as general manager include

4  financial management?

5  A.  Yes, they do.

6  Q.  How long has Cavel had a plant in DeKalb?

7  A.  The plant has been in DeKalb since 1987.

8          MR. CALABRESE:  Your Honor, may I approach the witness?

9          THE COURT:  Yes.

10         MR. CALABRESE:  I would like to show him a document.

11  I'll ask the court reporter to mark this as Exhibit 1.

12  BY MR. CALABRESE:

13  Q.  All right.  Sir, you have a document that we have marked as

14  Exhibit 1 in front of you.  Would you just please tell the court

15  what this is?

16  A.  This is a document issued by the United States Department of

17  Agriculture.  It's entitled grant of inspection.  It's a

18  document that a plant that has passed various preliminary

19  inspections and filings, the plant is given this grant of

20  inspection in order to produce food.

21  Q.  Is this a document that Cavel retains in the course of its

22  business?

23  A.  Correct.

24  Q.  What is the date of this document?.

25  A.  March 24, 1987.

Tucker - Direct

1    MR. CALABRESE: Your Honor, I would just ask you a

2    procedural question. I'd be happy to move this into evidence

3    now, or we have some additional documents. I would be happy to

4    take them all at one time.

5    THE COURT: I'd like to take them one at a time.

6    MR. CALABRESE: Okay. Then at this time I would move

7    Exhibit 1 into evidence.

8    THE COURT: Any objection?

9    MR. FARRELL: No objection.

10    MS. FLEISCHMANN: I object on the basis of relevance.

11    MR. CALABRESE: The relevance, your Honor, is simple.

12    It's how long the plant's been in operation. This is a

13    recognition by the federal government of that.

14    THE COURT: I'll overrule the objection. I'll allow

15    Plaintiffs' 1 to be admitted.

16    MR. CALABRESE: Thank you, your Honor.

17    (Plaintiffs' Exhibit 1 was offered and received in

18    evidence.)

19    BY MR. CALABRESE:

20    Q. Mr. Tucker, does Cavel have other plants where it processes

21    horse meat?

22    A. No.

23    Q. Has Cavel ever had other plants?

24    A. No.

25    Q. Does Cavel have any assets other than those that are at the

Tucker - Direct

1   plant in DeKalb?

2   A.   No.

3   Q.   Would you please describe for the court what Cavel's

4   business is?

5   A.   We're a slaughterhouse/meat packer.  We produce horse meat

6   for food.  We purchase livestock from buyers and the general

7   public at the plant.  We slaughter those animals and prepare the

8   meat for food, and in our market it is all exported.

9   Q.   I want to ask you a little bit now about the production

10  process, starting at the front end when horses arrive at the

11  plant.  How is it that horses are brought to the plant?

12       MS. FLEISCHMANN:  Objection, your Honor.  I don't

13  understand how this is relevant at all to the complaint or to

14  the issue of whether the law is constitutional.

15       MR. CALABRESE:  Your Honor, the amici have raised human

16  treatment of animals as an interest in this statute here, and I

17  think it's directly relevant to issues going to humane

18  treatment.

19       MS. FLEISCHMANN:  Counsel specifically objected to the

20  amici presenting evidence on this issue.  So, they won't be.  I

21  don't think that this is relevant to the matters in the

22  complaint.

23       MR. CALABRESE:  If the legal argument will not be

24  considered, perhaps we can move on, but the legal argument may

25  be presented by the amici and considered by the court.

1    THE COURT: I'll overrule the objection. You may

2  answer the question.

3  BY THE WITNESS:

4  A. We contract with certain buyers that buy horses in the

5  general markets, generally auctions in various states throughout

6  the Midwest and West and East and South, for that matter. Those

7  horses are brought to us by transport arranged by the buyers or

8  by the people selling us the horses.

9    The horses are unloaded at the plant under government

10  inspection. The horses are examined by the USDA veterinarian

11  before they're slaughtered. They're slaughtered -- I mean, we

12  unload them into pens, which are in the back of the plant.

13  They're inside the plant. The horses are brought to the kill

14  floor, euthanized, otherwise dressed out to carcass form.

15    We then chill those carcasses overnight. The meat is

16  sold either in fresh carcass form or boxed meat. The boxed meat

17  can be sold either as fresh or frozen, and it's shipped within a

18  few days to the customer.

19  BY MR. CALABRESE:

20  Q. When the horses are in transport to the plant, are they

21  owned by Cavel?

22  A. No.

23  Q. Does Cavel own the trucks that transport the horses?

24  A. No.

25  Q. You mentioned buyers who acquire horses at auction. Where

Tucker - Direct

1    do they acquire horses that they sell to you?

2    A.   Most generally at various public auctions throughout the

3    United States.

4    Q.   Do those auctions take place outside of Illinois?

5    A.   Yes, they do.

6    Q.   Do most of the horses that Cavel acquires come from outside

7    of Illinois?

8    A.   Most of them do, yes.

9    Q.   Does Cavel acquire any horses from inside Illinois?

10   A.   Yes.   The horses that come to us in Illinois are generally

11   brought to us by their owners.   It's just more efficient for the

12   owner to bring the horse directly to the plant instead of taking

13   it to an auction.

14   Q.   And when a buyer brings his or her horse to you, does Cavel

15   disclose that the horse will be slaughtered for human

16   consumption?

17   A.   Yes, we do.

18   Q.   How often are Cavel's operations inspected by state,

19   federal, or local officials?

20   A.   We have a USDA veterinarian on the premises whenever we're

21   processing.   The person is our inspector in charge, that is,

22   they are responsible for all USDA regulations in the plant.

23   They're under the FSIS or Food Safety Inspection Service portion

24   of the USDA.

25           There's also an inspector, an animal technician under

Tucker - Direct

1   the Animal Plant Health Inspection Service, that inspects all

2   the animals that arrive by truck under the Horse Transportation

3   to Slaughter Act.  And we also have an inspector that inspects

4   us for sanitation.  The person is not there full time, but

5   inspects us daily.

6   Q.  So, at any one time how many inspectors are on site at the

7   plant?

8   A.  Two or three.

9   Q.  And how many days per week typically does Cavel operate?

10  A.  Five or six days.

11  Q.  Are there regulations or guidelines that Cavel follows when

12  slaughtering horses?

13  A.  Yes, there are.

14  Q.  And what are those?

15  A.  There's a myriad of rules concerning the handling of the

16  livestock and euthanizing of the livestock and otherwise

17  processing the meat.  Concerning animals specifically, there are

18  rules under the Horse Transportation Law that requires food and

19  water to be provided upon arrival at the plant, humane treatment

20  as the horses are moved from pen to pen or to the kill floor.

21  The regulations require a humane method of euthanasia.  And I'm

22  probably missing a few.

23  Q.  Does Cavel sell any horse meat other than for human

24  consumption?

25  A.  Very, very little.

1    Q.  Approximately how much of Cavel's business would that be?

2    A.  It would be much less than one percent.

3    Q.  Does Cavel sell any parts of the horse carcass?

4    A.  We do.  There are several markets which we've sold to over

5    the years.  Currently we are selling ovaries for research.

6    We're selling horse pericardia for -- I believe they make human

7    heart valves out of it.  We have sold in the past spleens for

8    pharmaceutical use.  Various things.

9           We give away a certain amount of product for research.

10   If a non-for-profit or a group that's studying horses wants

11   samples or parts, we give it to them without charge if they pick

12   them up at the plant, and we do that in large numbers, such as

13   cadaver legs are in demand for 4H clubs and universities and

14   whatever to study the hoof of the animal, and other parts are

15   asked for.

16   Q.  When Cavel sells parts of the horse carcass, approximately

17   how much of the company's business does that involve?

18   A.  It's a very small amount.  It's probably around one percent

19   or so.  It's not a significant amount.

20   Q.  How much of the horse meat that Cavel processes for human

21   consumption is exported overseas?

22   A.  A hundred percent.

23   Q.  And what countries are Cavel's customers located in?

24   A.  Generally, the customers are in Europe, around the central

25   part of Western Europe.  The countries include Belgium, France,

Tucker - Direct

1   Switzerland, Italy, some market in Germany and the Netherlands.

2   Q.  Does Cavel sell any horse meat for human consumption in

3   Illinois?

4   A.  No.

5   Q.  Does Cavel sell any horse meat for human consumption in the

6   United States?

7   A.  No.

8   Q.  Once Cavel packages horse meat that's intended for human

9   consumption, when it leaves the plant, where does it go?

10  A.  Well, it's packaged.  It's sealed with the USDA seals and

11  all that.  The fresh meat generally goes by air.  It goes by --

12  we load it in a truck.  It goes to the airport, and it's flown

13  out to Europe.  The frozen meat goes in an oceangoing container

14  and taken by truck to rail yards and the rail yards to the ports

15  and the ports overseas.

16  Q.  What is Cavel's plant in DeKalb designed for?

17  A.  It's specifically designed for the market we're in, the

18  horse meat for export.

19  Q.  Has Cavel's plant in DeKalb ever slaughtered animals other

20  than horses?

21  A.  No, not the current plant.

22  Q.  Would the money Cavel makes from the sale of horse meat for

23  other purposes that we talked earlier allow Cavel to stay in

24  business?

25  A.  No.

Tucker - Direct

1    Q.  Now, on the day that the Governor signed House Bill 1711

2    into law, how many employees did Cavel have?

3    A.  I believe it's around 62, something like that.

4    Q.  Did Cavel operate between the time the Governor signed the

5    bill and the time the court issued the temporary restraining

6    order?

7    A.  No.

8    Q.  And during that period of time, what happened to Cavel's

9    employees?

10   A.  Well, they were all laid off, except for a few that were

11   retained for maintenance of the equipment, etc.

12   Q.  And what happened to Cavel's business during that time?

13   A.  Well, we lost that business.

14   Q.  After the temporary restraining order issued, did Cavel

15   start operating again?

16   A.  Yes, we did.

17   Q.  And when?

18   A.  Within a day of the ruling, I believe.

19   Q.  And what happened to the employees who had been laid off?

20   A.  They were all asked back, and I believe we got most of them

21   back; though, it's been hard.  We've missed a few.

22   Q.  Were any of the employees who didn't come back plaintiffs in

23   this lawsuit?

24   A.  I don't believe so.

25   Q.  To your knowledge, are there other plants in Illinois that

Tucker - Direct

1    slaughter horses for human consumption?

2    A.   No.

3    Q.   To your knowledge, are there other plants in the United

4    States that slaughter horses for human consumption?

5    A.   No.

6            MR. CALABRESE:  Nothing further at this time, your

7    Honor.

8            THE COURT:  Cross.

9            MS. FLEISCHMANN:  Yes.  Thank you.

10                   CROSS EXAMINATION

11   BY MS. FLEISCHMANN:

12   Q.   Sir, Cavel is a Virginia corporation; is that correct?

13   A.   That's correct.

14   Q.   And it's a subsidiary of a larger corporation; is that

15   correct?

16   A.   It's a subsidiary of a U.S. corporation, yes.

17   Q.   And what is that U.S. corporation?

18   A.   Van Damme Holding Company.

19   Q.   And where is that incorporated?

20   A.   DeKalb, also.

21   Q.   I'm sorry?

22   A.   DeKalb.

23   Q.   And the U.S. produces .8 percent of the horse meat consumed

24   in the world?  Is that correct to your knowledge?

25   A.   I don't really know.

LEXSEE 1997 U.S. DIST. LEXIS 2318

**LUELLA PENNINGTON, individually and on behalf of other similarly situated persons, Plaintiffs, v. LYNN DOHERTY, Director of the Illinois Department of Employment Security, in her official capacity, Defendant.**

**85 C 6327**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1997 U.S. Dist. LEXIS 2318; Unemployment Ins. Rep. (CCH) P22,184**

**February 25, 1997, Decided**
**February 27, 1997, DOCKETED**

**DISPOSITION:** [*1] Director's motion granted and permanent injunction and judgment entered in accordance with Judge Plunkett's Opinion stayed pending Court of Appeals' decision. Pennington's motion for supplemental relief denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff unemployed filed a motion for supplemental relief to require defendant Director of the Illinois Department of Employment Security (director) to adopt an alternative to § 237 of the Illinois Unemployment Insurance Act, 820 Ill. Comp. Stat. 405/237. The director filed a motion to stay a permanent injunction issued by a single justice of the court, which prohibited the director from enforcing § 237, pending an appeal of the injunction.

**OVERVIEW:** Pursuant to § 237, parts of claimants' wages were not considered in determining eligibility for unemployment compensation. The unemployed filed a class action against the director, claiming that § 237 violated the "when due" clause of the Social Security Act, 42 U.S.C.S. § 503(a)(1). The court entered a judgment for the director. The appellate court reversed the judgment. On remand, a single justice of the court issued a permanent injunction prohibiting the director from enforcing § 237, 820 Ill. Comp. Stat. 405/237. The unemployed filed a motion for supplemental relief, seeking an order requiring the director to adopt an alternative to § 237. The director filed a motion to stay the injunction pending a decision by the appellate court.

The court stayed the injunction and denied the unemployed's motion. The court held that the director had not shown a likelihood of success on the merits. However, the court determined that the director would be irreparably injured if the injunction remained in force, that the temporary loss of income by the unemployed resulting from staying the injunction would not constitute irreparable injury, and that the public interest favored the director.

**OUTCOME:** The court granted the director's motion to stay the injunction pending a decision by the appellate court. The court denied the unemployed's motion for supplemental relief.

**COUNSEL:** For LUELLA PENNINGTON, plaintiff: William J. Martinez, Karyn S. Glass, Legal Assistance Foundation of Chicago, Chicago, IL. Jeffrey Bensley Gilbert, Johnson, Jones, Snelling & Gilbert, Chicago, IL. Robert E. Lehrer, Lehrer & Redleaf, Chicago, IL.

For SALLY WARD, defendant: Michael T. Prousis, Barry Layfer, Illinois Attorney General's Office, Chicago, IL.

For SALLY WARD, third-party plaintiff: Michael T. Prousis, (See above), Barry Layfer, (See above).

For U.S. DEPARTMENT OF LABOR, third-party defendant: Sandra M. Schraibman, Judry L. Subar, United States Department of Justice, Washington, DC.



EXHIBIT
3

Page 2

1997 U.S. Dist. LEXIS 2318, *1; Unemployment Ins. Rep. (CCH) P22,184

**JUDGES:** Milton I. Shadur, UNITED STATES DISTRICT JUDGE. Milton I. Shadur, Judge, Sitting by designation. Paul E. Plunkett, Judge

**OPINION BY:** Milton I. Shadur

**OPINION**

*MEMORANDUM OPINION AND ORDER*

On February 1, 1996 this Court's colleague Honorable Paul Plunkett entered a permanent injunction that, for reasons stated in the "Opinion" (1996 WL 41492) [1] prohibited Director [*2] of the Illinois Department of Employment Security ("Director") Lynn Doherty from applying Illinois Unemployment Insurance Act § 237, 820 ILCS 405/237 ("Section 237"), to the plaintiff class. Director's appeal of that decision was argued before the Court of Appeals on October 23, 1996 and is awaiting decision.

> 1   Citations to the Opinion will take the form "Opinion at *--," referring to the Westlaw pagination without repeating the WL number.

Name plaintiff Luella Pennington ("Pennington") has now moved for supplemental relief on the ground that Director has failed to take adequate steps to adopt an "alternative base period" ("ABP"), and she seeks an order requiring Director to do so within 30 days. In response Director in effect seeks a stay of enforcement of the judgment (the permanent injunction) pending the decision on appeal. For the reasons set forth in this memorandum opinion and order, Pennington's motion for supplemental relief is denied and Director's motion for a stay of enforcement is granted.

**[*3] Background**

2

> 2   Because the facts of this case are set forth at some length in the Opinion, they are not restated in detail here except as necessary to resolve the current motions.

In 1985 Pennington brought this action on behalf of herself and other claimants who had been denied unemployment compensation, or whose benefits had been delayed, because of the manner in which Section 237 defines "base period" as the first four of the last five

completed quarters immediately preceding the claimant's benefit year. [3] Each claimant must meet the statutory requirements as to the amount of wages earned during his or her base period to be monetarily eligible for benefits. As a result of the manner in which Section 237 defines "base period," a claimant's wages earned during the most recent completed quarter (the "lag quarter") and during the quarter in which the claim for benefits was filed (the "filing quarter") are not considered in determining monetary eligibility.

> 3   For initial claims, a "benefit year" is the one-year period beginning on the first day of the week (Sunday) in which the claimant first files a valid claim for benefits (820 ILCS 405/242).

**[*4]** Pennington asserted that Section 237 violates the "when due" clause of the Social Security Act, 42 U.S.C. § 503(a)(1). [4] For that purpose the key issue was whether Section 237 constituted an eligibility requirement or an administrative provision, for only the latter are subject to the "when due" clause. After a bench trial, Judge Plunkett ruled in 1992 that Section 237 was an eligibility requirement and entered judgment in Director's favor.

> 4   That clause requires states to employ "such methods of administration ... as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due."

Pennington appealed, and the Court of Appeals reversed, concluding instead that Section 237 was an administrative provision ( *Pennington v. Didrickson*, 22 F.3d 1376, 1387 (7th Cir. 1994)). It remanded the case for determination of whether Section 237 violated the "when due" clause.

On remand, Judge Plunkett considered additional evidence submitted by the parties [*5] and ruled that Section 237 did violate the "when due" clause. After weighing the costs to Director of adopting an ABP against the benefits to the plaintiff class in terms of both (1) additional amounts paid and (2) greater promptness in making payments, Judge Plunkett held (Opinion at *12, citations omitted):

> On this basis, we conclude that section 237 violates the "when due" clause because it does not insure the greatest

Page 3

1997 U.S. Dist. LEXIS 2318, *5; Unemployment Ins. Rep. (CCH) P22,184

promptness in paying unemployment insurance benefits that is administratively feasible. IDES may not continue to use its current system simply to avoid the administrative costs it would incur by adopting by ABP. While, conceivably, increased administrative costs could be so great that they demonstrate that an alternative system would not be administratively feasible, even the highest cost estimates in this case do not support that conclusion here. Moreover, while we believe the exclusion of lag quarter wages was administratively necessary at one time because [state employment security agencies] needed the lag quarter to compile employer wage report information, we are persuaded by the observation of the Advisory Council on Unemployment Compensation that [*6] "advances in technology have made it feasible for all states to use the most recently completed quarter [i.e., the lag quarter] when determining benefit eligibility." At the present time, section 237 does not strike a reasonable balance between the plaintiffs' interest in prompt payment of benefits and IDES' interest in minimizing the costs of eliminating delay and in preventing fraudulent claims. Therefore, we hold that section 237 violates the "when due" clause.

Despite that ruling invalidating Section 237, Judge Plunkett rejected Pennington's request for an order requiring Director to submit an ABP to him with reasonable promptness, noting (id.) that the Court of Appeals had explicitly stated (22 F.3d at 1388) that the choice of an alternative to Section 237 was up to the State of Illinois and not the district court. Instead, he enjoined Director from applying Section 237 to the plaintiff class and retained jurisdiction to enforce that judgment (Opinion at *12).

Director promptly sought a stay of enforcement of the judgment pending the outcome of her appeal. Judge Plunkett denied the motion without prejudice because she had failed to make the appropriate showing, but [*7] he invited her to renew it if proper grounds arose in the

future. Director did not renew the motion, nor was a stay entered by the Court of Appeals.

Pennington now seeks supplemental relief on the ground that in the time since the judgment was entered Director has not taken adequate steps to implement an ABP. Pennington seeks an order requiring Director within 30 days to submit a specific plan for an ABP, including a timetable for its implementation. Director opposes the motion, asserting that she has taken all possible steps to adopt an ABP without incurring significant costs and that any further steps would both involve a cost of between $ 150,000 to $ 200,000 and would be rendered unnecessary if she prevails on appeal. Construing Director's response to the motion as a request for stay of enforcement of the judgment, this Court gave Director an opportunity to supplement her submission to provide evidence that a stay of enforcement was appropriate.

### Stay of Enforcement

Although posed in the form of Pennington's motion for supplemental relief, the real issue is whether Director is entitled to a stay of enforcement of the judgment pending the outcome of her appeal. That [*8] being so, the matter will be viewed as if it were before this Court on Director's motion for such a stay.

On that score Fed. R. Civ. P. ("Rule") 62(c) permits a district court among other things to suspend an injunction during the pendency of an appeal on such conditions as it deems appropriate to protect the rights of the winning party. Hilton v. Braunskill, 481 U.S. 770, 776, 95 L. Ed. 2d 724, 107 S. Ct. 2113 (1987) teaches that four factors must be considered in deciding a motion under Rule 62(c):

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Even where an applicant cannot show that he or she has a substantial likelihood of success on appeal, a stay may be appropriate if the other factors weigh strongly in the applicant's favor (an application of the "sliding scale"

Page 4

1997 U.S. Dist. LEXIS 2318, *8; Unemployment Ins. Rep. (CCH) P22,184

approach applicable in considering preliminary injunctive relief -- see *Thomas v. City of Evanston*, 636 F. Supp. 587, 590-91 [*9] (N.D. Ill. 1986) and cases cited there; accord, *Miller v. LeSea Broad., Inc.*, 927 F. Supp. 1148, 1151-52 (E.D. Wis. 1996)).

From the parties' submissions this Court makes the following findings:

1. Director's proposed ABP would comprise the last four completed calendar quarters for claimants who are monetarily ineligible using Section 237's base period ( D. Supp. Mem. 2 P 4). That period would thus include a claimant's lag quarter wages but not his or her filing quarter wages.

2. While this case was on remand Director had an outside consultant prepare an analysis (submitted to Director January 11, 1995) of the required computer changes and associated costs necessary to implement that proposed ABP (D. Ex. B).

3. At the same time Director also had her staff prepare an analysis (completed on December 29, 1994) of how the proposed ABP would be implemented (D. Ex. C).

4. Since Judge Plunkett entered judgment in February 1996, Director's staff has met several times with the Employment Security Advisory Board regarding draft legislation to amend Section 237 (D. Mem. 5-6; see P. Ex. D.)

5. Director's staff has spent an additional 40-50 hours on matters related [*10] to implementation of an ABP (D. Mem. 6).

6. Director's next step would be to prepare a "Request for Proposal" ("RFP") from outside vendors for the performance of a "Requirements Definition" for implementation of an ABP, in order to identify more precisely the changes that would have to be made to Director's current computer system ( D. Supp. Mem. 3 P 6).

7. To prepare an RFP, Director would have to shift qualified staff from the "Year 2000 Project" and the "Telephone Certification Project." As suggested by their titles, the former project is charged with devising a method to permit Director's computer to recognize dates beyond the year 1999, while the latter is intended to permit claimants to submit bi-weekly work certifications by telephone rather than on paper ( D. Supp. Mem. 3 P 7 & n.4).

8. On a "Requirements Definition" the outside vendor's work alone would cost approximately $ 150,000 to $ 200,000, to which the expenditure of staff time would have to be added ( D. Supp. Mem 3 P 6; D. Mem. 6).

9. After the "Requirements Definition" had identified the necessary changes to Director's computer system, Director would have to prepare a second RFP for the actual implementation [*11] of those changes so that an ABP could be used ( D. Supp. Mem. 3 P 6).

10. All of the work on an RFP, as well as all additional work, could be unnecessary if the Court of Appeals were to reverse Judge Plunkett's February 1996 decision ( D. Supp. Mem. 5-6 P 12).

11. Pennington has identified no harm to the plaintiff class other than delay if her motion is denied.

12. Director's proposed ABP system includes a "reachback" provision to permit her to identify ABP eligible claimants whose claims were effective before an ABP system was actually put in use, so that class members will belatedly receive all benefits to which they are entitled if they prevail on appeal ( D. Supp. Mem. 6 P 13).

It is against that backdrop that the *Hilton* factors must be applied.

Page 5

1997 U.S. Dist. LEXIS 2318, *11; Unemployment Ins. Rep. (CCH) P22,184

As to the first factor, Director has not made a substantial showing of likelihood of success on the merits. She argues only that Judge Plunkett erred in using a simple cost-benefit analysis in deciding whether Section 237 violates the "when due" clause ( D. Supp. Mem. 5 P 11). But she fails either to identify the proper analysis or to cite any authority supporting her position (*id.*). [5] Moreover, the central [*12] legal issue in this case, whether Section 237 constitutes an eligibility requirement or an administrative provision, has already been decided against Director (22 F.3d at 1387). Thus this prong weighs against the entry of a stay.

> 5 It is of course true that Director's appeal has been pending for some 120 days post-argument. But this Court will not engage in any attempt to divine the entrails of that passage of time -- to infer that it signals anything other than the normal delay in reaching an appellate decision and generating an opinion, rather than necessarily indicating the strength of appellant Director's position on the merits.

As to the second factor, Director has shown that she will be irreparably injured if a stay is wrongfully denied. Her evidence demonstrates that to prepare an RFP for a "Requirements Definition" she will be forced to remove qualified staff from two ongoing and important projects, one of which (the "Year 2000 Project") involves a significant computer programming problem and a concrete [*13] deadline. To complete those projects in a timely manner, the staff members might have to be replaced by outside vendors at additional cost to Director, who Judge Plunkett has already found to operate under budgetary constraints (Opinion at *11). While Pennington proposes that Director be ordered to prepare the RFP and obtain bids from vendors conditioned upon an adverse decision on appeal, requiring Director to go through that process now seems unnecessary. [6] There is no evidence that the RFP preparation and bid acceptance process is so time-consuming as to justify requiring Director to begin it before the appeal is decided. Moreover, all such efforts would be nonproductive if Director were to prevail on appeal. Director's evidence shows that she has gone as far as possible in the process of adopting an ABP without expending the time and resources that would be wasted if the Court of Appeals' decision is favorable to her. This second factor weighs in favor of the entry of a stay.

> 6 As a practical matter, it is uncertain how many vendors would be prepared to bid on a project that is conditioned on the favorable outcome of a lawsuit on appeal and that has an uncertain starting date if that eventuality takes place. Or to reframe the matter in straightforward economic terms, even as to willing bidders the existence of such multiple contingencies would seem certain to drive the bids upwards to reflect the risk of the bidders' providing a firm figure to take effect at an unspecified future date.

[*14] On the third element, Pennington has not shown that the plaintiff class would be substantially injured if a stay is granted. Director's adoption of a "reachback" provision means that if Director's appeal fails the class members will get all of the benefits to which they are entitled. Thus the only possible injury to them is delay. But Pennington has offered no evidence of how delaying implementation of an ABP would harm the plaintiff class.

In that respect there is authority from the highest quarter "that temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury" ( *Sampson v. Murray*, 415 U.S. 61, 90, 39 L. Ed. 2d 166, 94 S. Ct. 937 (1974)). And *Sampson* rejected temporary injunctive relief -- a denial essentially equivalent to granting the stay in Director's favor here -- on precisely that ground. Accord, *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1349 (7th Cir. 1982).

This Court is of course keenly aware that the class at issue comprises people claiming unemployment benefits, a group to whom the prospect of receiving money in the future rather than now may perhaps smack of what Justice Frankfurter said in [*15] concurring in *Griffin v. Illinois*, 351 U.S. 12, 23, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (a quotation repeated by Justice Stevens in disagreeing with the majority view in *Heckler v. Ringer*, 466 U.S. 602, 646, 80 L. Ed. 2d 622, 104 S. Ct. 2013 (1984)):

> To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the "majestic equality" of the law. "The law,

Page 6

1997 U.S. Dist. LEXIS 2318, *15; Unemployment Ins. Rep. (CCH) P22,184

in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." (John Cournos, A Modern Plutarch, p. 27.)

But what tips the scales for this Court is that fact that at best a material delay in the payment of benefits on a "reachback" basis is already built into what must be done if Judge Plunkett is correct, so that what is at stake here is a presumptively minor incremental delay until the Court of Appeals resolves the already-argued appeal on the merits. On balance, then, the third factor weighs substantially in favor of a stay.

Finally the public interest lies most strongly with Director. Undoubtedly the public has an interest as a matter of [*16] principle in seeing the plaintiff class receive rightful benefits sooner, but in light of what has just been said on the preceding element the public interest in seeing Director's staff and budget used efficiently weighs more heavily in the scales. That too favors a stay.

In sum, a weighing of the four *Hilton* factors supports Director's request for a stay of enforcement of the judgment, calling for the rejection of Pennington's request for supplemental relief. Significantly, Director's submissions have addressed the most important matter that Pennington sought to resolve, for Director has identified the ABP proposal that she will adopt if Judge Plunkett's decision is affirmed. Thus as a practical matter the only relief that Pennington is being denied is the presumptively brief deferral of the timetable for the implementation of an ABP if affirmance takes place.

### *Conclusion*

Director's papers in opposition to Pennington's motion for supplemental relief are construed as a motion to stay enforcement of the judgment. Director's motion to that effect is granted, and the permanent injunction and judgment entered in accordance with Judge Plunkett's Opinion is hereby stayed [*17] pending our Court of Appeals' decision. Pennington's motion for supplemental relief is denied.

**ENTER:**

Milton I. Shadur

**UNITED STATES DISTRICT JUDGE**

**DATED:** February 25, 1997

LEXSEE 1990 U.S. DIST. LEXIS 2630

**UNITED STATES OF AMERICA ex rel. ELLIS O. PARTEE, Plaintiff, v. MICHAEL P. LANE and JAMES H. THIERET, Defendant**

**Case No. 87 C 2814**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1990 U.S. Dist. LEXIS 2630**

**March 9, 1990, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The United States filed a motion for a stay of an order that granted an inmate's petition for habeas corpus.

**OVERVIEW:** The court issued a prior order that granted the inmate's petition for habeas corpus. The State filed a motion to stay the court's order granting the petition, and the court granted the motion. The same standard applied for issuing a stay in a habeas proceeding as in any other civil case. The court had to consider the following factors: whether the State made a strong showing on the merits, whether the State would be irreparably injured if the stay was not granted, whether a stay would substantially injure other parties, and public interest. The court found that the first factor slightly favored the State because the State had a substantial case. If an eyewitness was considered to be highly reliable, then it would be possible to show no prejudice to the inmate by his counsel's ineffectiveness. The second and third factors strongly favored the State. The State would be irreparably injured because it would have had to re-try the inmate within 90 days if the stay was not granted. Further, the inmate would not be injured by granting the stay because he was in custody on a separate charge for at least nine more years. The public interest factor was considered to be a toss-up.

**OUTCOME:** The court granted the motion for a stay.

**OPINION BY:** [*1] WILLIAMS

**OPINION**

*MEMORANDUM OPINION AND ORDER*

ANN CLAIRE WILLIAMS, UNITED STATES DISTRICT JUDGE

The State seeks a stay of this court's order granting Mr. Partee's petition for habeas corpus. The court grants this motion.

Under Hilton v. Braunskill, 107 S.Ct. 2113, 2119 (1987), district courts are directed to use the same standard for issuing a stay in a habeas case as in any other civil case. There are four factors to consider: (1) whether the stay applicant has made a strong showing on the merits, (2) whether the applicant will be irreparably injured if the stay is not granted, (3) whether issuing the stay will substantially injure the other parties interested in the proceeding, and (4) consideration of where the public interest lies. Id. Later in the opinion, the Court watered down the first criterion by saying that, if factors two and four favor the applicant for a stay, then "a substantial case on the merits" is sufficient to satisfy factor one. Id. at 2119-20. The Court also observed that there is a presumption of correctness as to the district court's opinion in a habeas petition, and also a presumption favoring release from custody when the petition [*2] is granted. Id. at 2118.

Although this court considers it a close question, the first factor favors the State. The State does not have particularly strong case on the merits, but it does have a substantial one. Its substance will likely focus on this


EXHIBIT
4

court's analysis of Strickland's prejudice prong, and the characterization of the State's one eyewitness. If that eyewitness is seen as highly reliable - unlike the way this court saw him - then it would be possible to find no prejudice to Mr. Partee due to his counsel's ineffectiveness. The court doubts that the State can show a substantial case on the merits with respect to Strickland's performance prong.

The second Hilton factor strongly favors the State. If a stay is not granted, the State will have to re-try Mr. Partee within 90 days, thus likely rendering its appeal moot. The third factor also strongly favors the State. Mr. Partee will not be injured if the court grants a stay, since he is in custody of a separate charge for at least nine more years. The State's interest in continuing custody is strongest when the remainder of a prisoner's sentence is

long. Hilton at 2119.

The last Hilton factor - public interest [*3] - is a toss-up. The public has an interest in getting a final resolution in the Seventh Circuit of the constitutional issues raised by this court's order; the public also has an interest in the State complying with the presumptively correct ruling of a federal district court regarding an issue of constitutional magnitude.

Since the second and third Hilton factors strongly favor the State, and the first factor does so slightly, the court grants the motion for a stay of its January 22, 1990 order which granted Mr. Partee's petition for the writ of habeas corpus.

*Dated: March 9, 1990*

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 07-5120

September Term, 2006

06cv00265

Filed On: May 1, 2007 [1037638]

The Humane Society of the United States, et al.,
    Appellees

    v.

Cavel International, Inc.,
    Appellant

Michael Johanns, Secretary, U.S. Department of
Agriculture and Barbara J. Masters, Administrator,
Food Safety and Inspection Service,
    Appellees

      **BEFORE:**    Rogers,* Brown, and Kavanaugh, Circuit Judges

## O R D E R

      Upon consideration of appellant's emergency motion for a stay of the district court's March 28, 2007 order, the response thereto, and the reply, it is

      **ORDERED** that the emergency motion for a stay be granted.

      The United States Department of Agriculture (USDA) promulgated an Interim Final Rule regarding a horse slaughter inspection system. Appellees (The Humane Society of the United States, et al.) challenged the rule on the ground that it violated requirements of the National Environmental Policy Act (NEPA) and Administrative Procedure Act. Appellant is an affected business and was an intervenor in the district court. The district court granted summary judgment to the appellees. Appellant then filed a notice of appeal and now seeks a stay pending appeal. As to likelihood of success on the merits, appellant argues that USDA regulations, see 7 C.F.R. § 1b.3(a), 7 C.F.R. § 1b.4, validly exclude USDA's Interim Final Rule from NEPA requirements and that USDA properly invoked that exclusion in this case. With respect to irreparable injury, appellant argues that it will go out of business absent a stay, because it will be

---

\* Judge Rogers would deny the emergency motion for a stay for the reasons set forth in the attached statement.



No. 07-5120                         September Term, 2006

unable to operate during the pendency of this appeal as a result of the district court's order. Appellant further argues that appellees will not be substantially harmed by a stay and that a stay will serve the public interest. Based on our analysis of the parties' submissions in light of the factors governing a stay pending appeal, we conclude that appellant has made a sufficient showing to justify a stay pending appeal. See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977).

**Per Curiam**

No. 07-5120, <u>Cavel International, Inc. v. Michael Johanns, Secretary, U.S. Department of Agriculture, et al.</u>

ROGERS, *Circuit Judge*, dissenting: The district court denied the motion of Cavel International, Inc. for a stay pending appeal of its March 28, 2007 order and I would deny Cavel's emergency motion to stay that order pending appeal. Among other things, the challenged order vacated the Food Safety and Inspection Service's ("FSIS") Interim Final Rule (involving fee-for-service ante-mortem horse inspections) because it violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 <u>et seq.</u> Cavel was, as of the time the district court order issued, the only U.S. facility still in operation processing horsemeat for human consumption.[1] I respectfully disagree with my colleagues that Cavel has met its burden of showing that a stay is justified. <u>See Va. Petroleum Jobbers Ass'n v. FPC</u>, 259 F.2d 921, 925 (D.C. Cir. 1958). <u>See generally Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 842-43 (D.C. Cir. 1977) (balancing the degree of likelihood of success on the merits; prospect of irreparable injury to plaintiff absent injunctive relief; harm to others; and the public interest). As the movant, Cavel cannot rely on bald assertions but must "justify the court's exercise of such an extraordinary remedy." <u>Cuomo v. U.S. Nuclear Regulatory Comm'n</u>, 772 F.2d 972, 978 (D.C. Cir. 1985). Neither the Government nor former competitors of Cavel have joined in its motion or filed an appeal of the March 28, 2007 order.

Cavel fails to demonstrate a likelihood of success on the merits. <u>See Blankenship v. Boyle</u>, 447 F.2d 1280 (D.C. Cir. 1971) (per curiam). First, Cavel argues that no environmental impact statement or environmental assessment was needed because a categorical exclusion under NEPA applies. The district court rejected the application of a categorical exclusion because nothing in the record suggests that the agency contemplated invoking the exclusion. Cavel provides no basis for this court to consider the agency's *post hoc* rationalization. <u>See generally SEC v. Chenery Corp.</u>, 318 U.S. 80, 87 (1943). Second, Cavel contends that the plaintiffs failed to prove that the Interim Final Rule may have a significant environmental effect. As Cavel reasons, the *inspection-related* activities at the establishments conducted by FSIS, considered independent of the horse-slaughter operations themselves, do not significantly affect the environment. But, as the district court recognized, the plaintiffs did not bear the burden to establish the environmental impact because the government defendants never made a no-extraordinary-circumstances determination that the exclusion should continue to apply. Moreover, the disjunction that Cavel posits between inspections and slaughterhouse activities blinks at the interconnected reality; Cavel points to nothing that would require us to upset the district court's finding of interconnectedness. Under the circumstances, Cavel fails to show "a substantial case on the merits." <u>See Holiday Tours</u>, 559 F.2d at 843.

Cavel asserts that it will sustain irreparable harm beyond mere economic losses absent a stay. In support, it proffers two sparsely-substantiated declarations, <u>see</u> Appellant's Emergency Motion for a Stay Exhs. 3, 4. Neither of these exhibits establishes the "certain and great" and

---

[1] Two slaughterhouses in Texas, intervenors below, have admitted that they are in violation of Texas law and have ceased operations. <u>See Empacadora de Carnes de Fresnillo v. Curry</u>, 476 F.3d 326, 336 (5th Cir. 2007).

imminent irreparable harm needed to justify imposition of a stay. Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Cavel's President, Luc Van Damme, declares that the company will be irreparably harmed absent a stay, because it would be "extremely difficult" to regain customers lost if it is unable to restart production. Van Damme Decl. ¶ 8. In Wisconsin Gas Co., this court held that "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." 758 F.2d at 674. To that end, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof that the harm is certain to occur in the near future." Id. Not only does Cavel fail to demonstrate that any harm will in fact occur, it concedes that when faced in the past with a two-year temporary shutdown occasioned by a fire, the company did not fold. Van Damme Decl. ¶ 9. If Cavel's competitive edge and financial security were not irreparably harmed then, how can it be that the current temporary shutdown would bring about the certain, great, imminent, and irreparable harm that would justify issuing a stay? Cavel does not explain. Also, until recently, Cavel had two domestic horse-slaughter competitors. But the other two plants closed prior to the district court's March 28 order. If Cavel was able to recover its clientele after a temporary shutdown when it faced competition, its current predicament without competition might be less dire than Cavel proposes. Cavel does not explain. Any customers or revenue that Cavel loses in the interim cannot constitution irreparable harm. See Cent. & S. Motor Freight Tariff Ass'n v. United States, 757 F.2d 301, 309 (D.C. Cir. 1985).

The declaration of Cavel's general manager, Tucker, is no more probative. Rather than discuss or explore alternatives to a total shutdown of operations (including ways to mitigate any economic losses, such as selling supplies or terminating rent payments to the facility's owner, Luc Van Damme) Tucker declares, without more, that the facility is "too small" to adapt to the slaughter of some other animals and "cannot operate profitably" were it to slaughter certain "exotic animals." These conclusory statements amount to no more than an articulation of a *potential*, rather than a certain, great, and irreparable economic harm that will necessarily result from the facility's shutdown during the pendency of the appeal. See Wisc. Gas Co., 758 F.2d at 674.

The likely harm to others and the public interest also weigh against entering a stay. Congress found real environmental and public health risks attendant to the slaughtering operations. See Plaintiffs-Appellees' Opposition to Emergency Motion for a Stay at 2-5 (citing legislative record of overwhelming bipartisan support for funding ban signed into law by President Bush on Nov. 10, 2005); see also Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-97, § 794, 119 Stat. 2120, 2164 (2005) Cavel has not met its burden to show the contrary. The district court noted in its Memorandum Opinion that neither Cavel nor the two since-shuttered Texas slaughterhouses "refute[s] Plaintiffs' argument that horse slaughter operations have 'significantly' impacted the environment within the meaning of NEPA as set forth in 40 C.F.R. § 1508.27." Mem. Op. of Mar. 28, 2007, at 16. Instead, their argument was that the *inspection-related* activities at the establishments conducted by FSIS, considered independent of the horse-slaughter operations themselves, do not significantly affect the environment. Id. at 17.

For these reasons, Cavel has failed to meet its burden to demonstrate to the court that a balance of the equities weighs in favor of issuing an emergency stay pending appeal.

AFFIDAVIT OF SERVICE

STATE OF ILLINOIS        )
                               ) SS
WINNEBAGO COUNTY   )

The undersigned certifies that on July 9, 2007, he served a copy of the ***Memorandum in Support of Plaintiffs' Emergency Motion for an Injunction Pending Appeal*** to all parties via the U.S. District Court CMS Electronic Filing System, and via facsimile on the following:

Lisa Madigan
c/o Rachel J. Fleischmann
Illinois Attorney General
100 West Randolph Street
13th Floor
Chicago, IL 60601
*Fax: (312) 814-4425*
*E-Mail: rfleischman@atg.state.il.us*

Ron Matekaitis
c/o John Farrell
State's Attorney
200 North Main Street
Sycamore, IL 60178
*Fax: (815) 895-7101*
*E-Mail: JFarrell@DeKalbCounty.org*

/s/ Thomas J. Lester

HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61101-1389
(815) 490-4900